(C. D. 1897)

INTER-MARITIME FORWARDING CO., INC. v. UNITED STATES

United States Customs Court, First Division

(Decided July 16, 1957)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Mollie Strum*, trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: Certain devices and parts thereof, invoiced as "Keeler Chixexers" and "Chixexer tubes," which are used for determining the sex of day-old chicks, were classified under paragraph 228 (b) of the Tariff Act of 1930 at the rate of 45 per centum ad valorem as optical instruments and parts thereof, not specially provided for. Plaintiff claims primarily that the merchandise is properly free of duty under paragraph 1604 of the act as "agricultural implements," not specially provided for. Alternatively, plaintiff claims these Chixexers and parts properly classifiable under paragraph 353 of the act, as amended by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739, at the rate of 13¾ per centum ad

valorem as articles having as an essential feature an electrical element or device.

Four witnesses testified on behalf of the importer. The first of these was Frank T. Harrison, vice president of Keeler Optical Products, Inc., distributor and seller of optical products. It appears that all of the "Chixexers" imported by the importing company herein are sold to the Newton Chick Sexing Co., Newton, Iowa. The "Chixexer" is employed by being inserted in the vent or rear of the chick and then, by looking through the tube (plaintiff's exhibit 3), the sex organs of the chick can be seen and the sex determined. After identifying the Chixexers as consisting of the tube (plaintiff's exhibit 3), the body of the instrument, a transformer, and an electric cord, which can be plugged in on house current, the witness testified as to the use of the imported instrument as follows:

You put the tube here, and you look through this point of the instrument, which gives you the magnification necessary to determine the sex of these chicks. (R. 10.)

Plaintiff's second witness was Merle L. Rogers, graduate of Cornell University, bachelor of science and master of science, who had majored in poultry husbandry. He had done research work at the University of Massachusetts in poultry breeding, had operated a farm of his own, and, for 28 years, had been an instructor in agriculture. He stated he had used Chixexers, such as those here imported, and had instructed students in their use. For the past 12 years, he had been in charge of the Poultry Department of the New York State University Institute of Agriculture at Cobleskill, N. Y., and, in this work, had operated its poultry farm (R. 18).

Mr. Rogers, explaining the importance of chick sexing, stated that the poultry industry is divided into two phases, egg production and meat production; that, in the field of egg production, the female chick, of course, is the one that produces the egg, and that it is, therefore, economically necessary to determine which chicks are males, since, if that can be done when they are a day old, the male chicks may be destroyed, thus making very substantial savings in feed, brooding equipment, housing space, and labor. With respect to the broiler industry, the witness stated that the male and female grow at a different rate; that broilers are being raised in flocks of 16,000 to 20,000 birds; that "If one is to go in there when they are ten weeks old, and sort out the 18,000 to 20,000 pullets, it would be quite a job"; but that the birds can be raised in two separate flocks, if they can be sexed beforehand.

Plaintiff's witness stated that the use of an instrument, such as plaintiff's exhibit 1, in the sexing of chicks has the advantage over that of the so-called "cloacal" or manual method, inasmuch as the

imported device magnifies, whereas the latter operation requires keen eyesight to disclose the sex organ, explaining that:

The tube is hollow. As I understand it, there are a series of mirrors that reflect the light down that tube so you can see the inside of the chick. You look through the intestinal wall. If you are sexing turkeys, you would use a slightly larger tube. (R. 33.)

The witness then stated that a poultry farmer "is an individual or collection of individuals who produces eggs and/or meat for human consumption, and/or the reproduction of the birds," and a poultry farm is a place where such processes take place. He defined a hatchery as "a place where baby chicks are hatched," which, he stated, was "an essential part of poultry raising," stating that "Many of the hatcheries rear chicks in addition" (R. 26–28).

On cross-examination, Mr. Rogers testified that the imported Chixexer is always used optically (R. 37). He admitted that the greater percentage of all chickens hatched come from commercial hatcheries and that, although he visits about 20 to 30 farms a year, he had not seen the imported instruments in use on poultry farms he visited. The witness further stated that a professional chick sexer can sex from 400 to 600 chicks per hour; that the art of chick sexing requires special training; and that it would take experience and some learning to gain skill and speed in the use of plaintiff's exhibit 1; further, if exhibit 1 were used by an inexperienced person, the chicks could be injured internally (R. 44).

John P. Moore, assistant manager of the Newton Chick Sexing Co., stated that his company has purchased between 100 and 200 of the involved instruments from the importer herein. He testified that he has used such devices and, in connection with his work, has visited hatcheries in various sections of the United States, instructing persons in their use. The witness' testimony, with respect to the importance of using the Chixexer and as to the manner in which the device is used in determining the sex of the chick, was, with some clarification, substantially the same as that of the previous witness (R. 55–59). Mr. Moore further testified that he had sold Chixexers, such as plaintiff's exhibit 1, to "poultry producers," which he defined as those that handle "any phase of the breeding, hatching, production of poultry and eggs for human consumption" (R. 63–64).

On cross-examination, Mr. Moore stated that, in his opinion, every hatchery is a "farm," but agreed that not every chick sexer is a poultry producer; and that, in order for a person to be an expert chick sexer, he would need expert training (R. 66–67). In his opinion, "commercial" hatcheries, which buy hatching eggs from outside sources, then hatch the eggs, and do not raise the chicks but sell them when they are a day old, are "farms" (R. 70). The witness further testified that 95 per centum of those to whom he sells Chixexers raise poultry, in addition to hatching eggs (R. 81).

Plaintiff's last witness was Don M. Turnbull, executive secretary of the American Poultry and Hatchery Federation, a trade association of poultry breeders and hatcherymen, which disseminates information to members about developments in the industry and which acts as a liaison unit between the industry and various departments of the Government. He stated that he has visited many poultry-breeding establishments, commercial broiler units, and large egg-producing farms throughout the United States. He was in agreement with the testimony of the previous witness as to the importance of determining the sex of a chick at an early age (R. 84). The witness testified that hatcheries "to a limited extent" raise poultry, in addition to hatching eggs, explaining that a survey conducted by his organization several years ago disclosed that about 75 per centum of the hatcheries investigated owned their own flocks and obtained their hatching eggs therefrom, supplementing them with purchases from other farms (R. 88).

The Government's first witness was Oliver G. Tobey, president and treasurer of Tobey, Inc., Hartford, Conn., whose business is "the sex separation of day old baby chicks," employing at the height of the season from 38 to 40 people as chick sexers. He testified that, since 1941, he and his firm had done all of the chick sexing for one of the largest commercial hatcheries in the United States and also for what he believed to be the largest breeder hatchery in the world. He stated that, since 1938, he had sexed between eight and ten million chicks. The witness testified that he had taught chick-sexing methods to students and has worked on hundreds of commercial and breeder hatcheries in the Northeast as a chick sexer, the vent-sexing method (R. 100). Mr. Tobey stated that a breeder hatchery is a hatchery or poultry farm that raises, breeds poultry beyond the day-old stage, and hatches the eggs, i. e., puts them back out and reproduces the stock, not only for itself, but to sell, and described a "commercial" hatchery as one wherein the chicks all go out of the hatchery when they are a day old. Mr. Tobey, while substantially agreeing with the previous testimony that "approximately 75 percent of all hatcheries in the country are breeder hatcheries" (R. 102), testified that:

The greatest percentage of all baby chicks are hatched by commercial hatcheries which are those hatcheries who have no facilities for raising them. (R.107–108.)

and stated that, in his opinion, a commercial hatchery is not a "farm." The witness further testified that he did not know of any hatcherymen who do chick sexing themselves, but that it is customary in the industry to employ specialized chick sexers to ascertain the sex of day-old chicks because "it is a very highly specialized art" (R. 109–110). Mr. Tobey then testified that, in the event of a cancellation of an order for baby chicks, the "commercial" hatchery has holding rooms for their care, but stated that that would be a very incidental part of the business of a commercial hatchery (R. 117–120).

The defendant's last witness was George Okazaki, assistant general manager with the American Chick Sexing Association, which furnishes chick-sexing service to hatcherymen throughout the United States. His duties include supervision of over 300 chick sexers and the direction of a company chick-sexing school, in which he also teaches. It appears that, since 1933, this witness has personally sexed from four to five million chicks.

Mr. Okazaki, who has visited farms and hatcheries throughout the United States, testified that, based upon his experience with commercial hatcheries, a commercial hatchery does not come within the definition of a "farm" (R. 133) and, further, that the chicks hatched by commercial hatcheries are sexed before they reach the people who raise the poultry (R. 135–136). Mr. Okazaki then testified that plaintiff's exhibit 1 is designed for the use of those in the trade of chick sexing.

This court and our appellate court have previously passed upon the question as to what constitutes an agricultural implement under the free-list provisions reading "all other agricultural implements of any kind or [and] description, not specially provided for," certain decisions on which matter we now deem pertinent to refer to in our present determination.

In *Wonham (Inc.) et al.* v. *United States*, 20 C. C. P. A. (Customs) 198, T. D. 45982, certain bamboo rakes were held not free of duty as agricultural implements under paragraph 1504 of the Tariff Act of 1922, because the record failed to show that they belonged to the class of articles which were chiefly used as agricultural implements at or immediately prior to the enactment of the pertinent tariff act. The court therein cited as authority *United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T. D. 35472; *United States* v. *Tower*, 6 Ct. Cust. Appls. 562, T. D. 36199; *Wilbur-Ellis Co. et al.* v. *United States*, 18 C. C. P. A. (Customs) 472, T. D. 44762.

In *United States* v. *Boker & Co., supra*, the court, in discussing the meaning to be given to the word "agricultural," as applied to hedge shears for pruning trees and shrubbery, page 244, stated:

While, therefore, "agriculture" in its broad application may extend into and include elements of horticulture, viticulture, arbor culture, and other *allied* industries and pursuits, in its primary significance it extends to and embraces only those parts of all such as pertain to human and incidental animal subsistence—the substantial requirements of life (food) and possibly man's comfort (raiment), and not the merely pleasurable pursuits; the necessities and not the essentially pleasurable or ornamental.

The case of *United States* v. *Tower, supra*, involved rakes in part of metal. Under the authority of the *Boker & Co.* case, *supra*, the court concluded that the involved articles "serve no purpose in the production of food from the soil, nor in the raising of domestic animals

thereon," but that they were used for the improvement of ornamental lawns and, therefore, were not agricultural implements.

In *United States* v. *Spreckels Creameries, Inc.*, 17 C. C. P. A. (Customs) 400, T. D. 43835, the importation consisted of metal cans, used by creamery companies for the transportation of milk. It appeared that the testimony therein was not sufficient to establish the fact that the chief use of the involved milk cans was upon the farm or by farmers, nor was it sufficient even to show that chief use was for transportation by cooperative creamery organizations, composed of farmers. Upon the record therein presented, the court held the involved metal cans were properly classifiable as manufactures of metal under paragraph 399 of the relevant act and not as agricultural implements, as claimed.

In *State Flax Industry* v. *United States*, 73 Treas. Dec. 664, T. D. 49515, certain machines, invoiced as "Eccentric Flax Straw Breaker," "Tow Shaker Type Vansteenkiste," and "Flax Straw Butting Machine," were held not agricultural implements, in that they were used elsewhere than on the farm in preparing flax for the use of the spinners thereof. The court therein, page 669, quoted from the case of *Ohio Butterine Co.* v. *United States*, 34 Treas. Dec. 465, T. D. 37656, as follows:

> To be deemed agricultural in any sense—to say nothing of the restricted meaning judicially enunciated as the congressional understanding of the term as expressed in the language of paragraph 391—an article must necessarily be shown to have some use on the farm, either in connection with the utilization and cultivation of the soil or with the harvesting of the crops raised thereon.
>
> *       *       *       *       *       *       *
>
> "Agriculture" is defined in the Standard Dictionary as—
>
> > 1. The *cultivation* of the soil for food products, or any other useful or valuable growths of the *field* or *garden*; *tillage, husbandry*, also by extension, *farming*, including any industry practiced by a *cultivator of the soil* in connection with such cultivation, as the breeding and rearing of food stock, dairying, etc.

See also, in the above connection, *J. M. McCullough's Sons Co.* v. *United States*, 51 Treas. Dec. 1091, Abstract 2055.

From the authorities hereinabove cited, it appears well-settled law that chief use is the governing rule or test which must be applied to an article to bring it within the provisions of paragraph 1604, here in issue, for "agricultural implements."

Counsel for the plaintiff directs our attention to the holding of our appellate court in *United States* v. *S. S. Perry*, 25 C. C. P. A. (Customs) 282, T. D. 49395. In that case, the court, in holding celluloid poultry leg bands, chiefly used for the identification of poultry, free of duty as agricultural implements, pages 286–287, stated:

> * * * After much consideration, we are of the opinion that the raising of poultry is an agricultural pursuit in the same sense that the raising of livestock

would be. * * * We also conclude that the celluloid poultry leg bands at bar, used for identification purposes, serve a purpose in the successful and efficient raising of poultry and if they were chiefly so used at or immediately prior to the passage of the Tariff Act of 1930 they should be regarded as agricultural in their character. * * *

\*    \*    \*    \*    \*    \*    \*

It seems to us that the poultry bands at bar are implements of the poultry raising business when chiefly used for the purpose of identification of poultry.

It appears that the poultry leg bands in the *S. S. Perry* case, *supra*, were placed on the leg of the chicken "By men who are commercially in that business of raising poultry." In the case at bar, however, the imported devices, known as "Chixexers," are designed for use by specialists known as chick sexers, who are not themselves hatcherymen or farmers or poultry producers but who render the service of chick sexing to the hatcherymen. The importer's own witness, Moore, testified that his company, the Newton Chick Sexing Co., which purchased Chixexers, such as plaintiff's exhibit 1, from the importing concern, employs 15 to 20 chick sexers and stated that these chick sexers are not paid by the hatcherymen for the services rendered, but are paid by the Newton Chick Sexing Co. It further appears that the hatcherymen pay the fee for the chick sexing to the chick-sexing company. Plaintiff's witness, Turnbull, who, as the record indicates, was associated with a federation, comprising 41 associations of poultry breeders and hatcherymen, testified that members of his association "retain specialists, who are chick sexers, who service the chicks, the one day old chicks," while stating "I believe there are some" of such members who have full-time chick sexers on their own farm or in their own hatchery. Defendant's witnesses did not know of any hatcherymen who do chick sexing themselves. The record further discloses that baby chicks should be sexed within the first 24 hours, because the characteristics which determine the sex of the chick are much less discernible after that period, and this operation requires the services of highly skilled persons trained in the art of chick sexing. It thus appears, from the record established in this case, that these chick sexers are not farmers and are not commercially engaged in the raising of poultry, but are persons who render specialized service to the hatcherymen. This, in our opinion, is one of the essential differences between the situation in the present case and that shown in the *S. S. Perry* case, *supra*, and, for the reasons stated, that case is distinguishable from the case at bar and persuades us to a different conclusion from that found in the cited case.

While we are of opinion that the plaintiff herein has failed to establish that the chief use of the imported articles are by "farmers" or that their chief use is on farms, this fact alone, in our view, is not determinative of the present issue. It is the essential character of the

articles in question and their designed use and purpose which we deem controlling.

There is testimony in the record, which appears to be not controverted, that the greatest percentage of all baby chicks are hatched by "commercial" hatcheries, which are those hatcheries which have no facilities for raising the chicks, and that 75 per centum of all the hatcheries in the country are "breeder" hatcheries. In this connection, we are not unmindful of the argument advanced by plaintiff's counsel that there is no testimony in this record that Chixexers, such as those imported, are used in so-called "commercial" hatcheries and that it makes no difference whether such hatcheries are "farms" or not. However, as disclosed by the record, the purpose of chick sexing is to determine the sex of day-old chicks and, whether done manually or by instruments, such as those at bar, it is the essential nature and purpose of the operation itself which determines whether devices employed in such connection, such as those here in question, are "agricultural implements," within the meaning of that term, as used in the tariff act. The record establishes to our satisfaction that the reason for ascertaining the sex of the chick is that the hatcheryman will receive a higher selling price for the female chick, because it produces the egg, and, further, that chick sexing does not in any way improve the particular chick as food or a food producer (R. 113, 134). This element, in our opinion, takes the imported articles out of the class of "agricultural implements." While the imported Chixexers are used in connection with agricultural pursuits, they are not *per se* "agricultural implements" and do not partake of the nature of those articles which are *eo nomine* mentioned in the paragraph of the act under which plaintiff claims they are properly classifiable. Except for the economic advantage gained in the saving of food and housing facilities, the use of the involved Chixexers does not contribute as such to the raising of poultry. As a matter of fact, it appears that when the sex of certain chicks is determined, they are then, in most cases, destroyed, and only those chicks are sold in the market or raised on farms for egg production and other purposes which are found economically advantageous to retain for the indicated uses.

The record establishes, without contradiction, that the imported articles are optical in nature. With respect to the visual use of the articles under consideration, one of the importer's witnesses explained that "you look through it with your right eye," and it appears that the Chixexer contains a series of mirrors that reflect the light. The descriptive literature describes the operation as "The new optical method of chick sexing * * * a first-class viewing system." The record further discloses that the principle of magnification is employed in the use of the imported Chixexers. The imported articles, therefore, meet the test for "optical instruments."

On the basis of the record here presented, we are of opinion and hold that the "Chixexers" at bar are not classifiable as "agricultural implements," not specially provided for, under paragraph 1604 of the Tariff Act of 1930, as claimed, but are properly classifiable under paragraph 228 (b) of said act at the rate of 45 per centum ad valorem under the provisions therein for optical instruments and parts thereof, not specially provided for, as classified. The protest in this case is overruled. Judgment will be entered accordingly.